**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division**

| | | |
|---|---|---|
| **KENNETH K. MILLER,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| v. | * | **Civil Action No.: CBD-14-2697** |
| | * | |
| | * | |
| **LIVE NATION WORLDWIDE, INC.,** | * | |
| **et al.,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |

***** 

<u>**MEMORANDUM OPINION**</u>

Before this Court are Defendant Live Nation Worldwide, Inc.'s Motion for Summary

Judgment (ECF No. 38) ("Live Nation's Motion"),[1] and Defendant Noble Associates

Worldwide, Inc.'s Cross-motion for Summary Judgment Against Defendant Live Nation (ECF

No. 41) ("Noble's Cross-motion").  The Court has reviewed Live Nation's Motion, Noble's

Motion as to Plaintiff's claims, Noble's Cross-motion, related memoranda, and applicable law.

No hearing is deemed necessary.  *See* Local Rule 105.6 (D. Md.).  For the reasons presented

below, the Court **GRANTS in part and DENIES in part** Live Nation's Motion, **DENIES**

Noble's Motion, and **DENIES** Noble's Cross-motion.

**I.      Factual Background**

Kenneth K. Miller ("Plaintiff") alleges that on May 4, 2012, he was attending a rock

concert at the Fillmore, a venue operated by Nation Worldwide, Inc. ("Live Nation"), in Silver

Spring, Maryland.  Pl.'s Compl. 1-3.  While observing the concert featuring the metal band

---

[1] Defendant Noble Associates Worldwide, Inc. ("Noble") joins Live Nation's Motion (hereinafter "Noble's Motion") as to Plaintiff's claims only.  *See* ECF No. 40.

Korn, Plaintiff was struck by a crowd surfer.[2]  *Id.*  Plaintiff, who was attending the concert with his teenage son, alleges that he was facing the stage, from the front row, when he was struck from behind.  *Id.* at 2, 4.  Plaintiff alleges that Noble was supposed to provide security and enforce the policy against crowd-surfing.  *Id.* at 4.

Plaintiff alleges that there were several visible signs at the Fillmore prohibiting crowd-surfing.[3]  *Id.* at 4.  Plaintiff further alleges that there was little or no crowd-surfing at the beginning of the concert, but everything changed when Korn performed "Freak on a Leash," a song that is known to encourage crowd-surfing.  *Id.*  Plaintiff alleges that the security personnel at the concert did not do anything to prohibit or discourage the crowd-surfing that ensued.  *Id.* at 5.

As a result of the incident, Plaintiff suffered fractured vertebrae, and a severed right vertebral artery.  *Id.* at 6.  Plaintiff underwent emergency surgery, and in the process, the surgeon had to manipulate Plaintiff's esophagus causing permanent injuries to his voice.  *Id.*  Plaintiff alleges that as a result of the permanent injuries, he continues to experience pain in his esophagus, difficulty eating, a stabbing pain in his right bicep, decreased strength in his right bicep, and a numbness in his index finger and right thumb.  *Id.* at 7.  As a result of the severed artery, Plaintiff has to take blood thinners for the rest of his life to prevent the possibility of a stroke.  *Id.*

On July 14, 2015, Noble filed its cross-claim against Live Nation (ECF No. 29) ("Noble's Cross-Claim").  In the cross-claim, Noble alleges that on the day of the concert, Noble's only obligation was to provide consulting services.  Noble's Cross-Claim 2-3.  Noble

---

[2] "Crowd-surfing occurs when the crowd hoists one or more crowd members above the crowd and passes the member around."  *Brewer v. Monqui, Inc.*, No. 53939–6–I, 2005 WL 1725709, at *1 (Wash. Ct. App. July 25, 2005).

[3] Live Nation and Noble do not dispute that there were several visible signs at the Fillmore prohibiting crowd-surfing.  *See* Live Nation's Mot. 3.

claims its responsibility was not to provide crowd control services, as it was originally stipulated in the Services Agreement it signed with Live Nation. *Id*.

The Services Agreement between Noble and Live Nation, executed on September 9, 2011 and set to terminate on August 1, 2013, provides that Noble was required to "provide crowd management services . . . including crowd management staff and security staff . . .". ECF No. 39-2, p. A-1, ¶1.  Noble was required to provide "(i) crowd control . . ., (iv) direction and control of the audience to deter any crowd disturbances." *Id*.  More specifically, Noble was required to "use best efforts to monitor, keep secure and maintain reasonable control over those individuals . . . body-surfing in the general admission area located directly in front of the stage and/or in front of a staffed barricade." ECF No. 39-2, p. A-1, ¶4.  The Services Agreement provided that the agreement "may not be amended, revised or terminated orally but only by a written instrument executed by the Party against which enforcement of the amendment, revision or termination is asserted." ECF No. 39-2, p. 3, ¶ 9(B).

Noble asserts in its Cross-motion that it was Live Nation's responsibility to provide crowd management services, and that Live Nation owes Noble defense and indemnification for this incident.  Noble's Cross-Claim 3.  Noble's Count I, therefore, demands judgment against Live Nation for indemnification and/or contribution for any and all judgment that Plaintiff may receive against Noble.  *Id*. at 4.  Noble's Count II for breach of contract alleges that under the Services Agreement, Live Nation owes Noble defense and indemnification.  *Id*. at 5.

## II.      Standard of Review

Under the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is deemed genuine only if the "evidence is such that a reasonable jury could return a verdict for the nonmoving

party," and a fact is deemed material only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Supreme Court has explained that the burden of proof lies with the movant to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A court reviewing a motion for summary judgment must view the evidence in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

This case involves a negligence claim.  To establish a claim for negligence in Maryland, the plaintiff must prove: "(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *Moore v. Jimel, Inc.*, 147 Md. App. 336, 337-38 (Md. Ct. Spec. App. 2002) (citing *Valentine v. On Target*, 353 Md. 544, 549 (1999)); *see also Rybas v. Riverview Hotel Corp.*, 21 F. Supp. 3d 548, 560 (D. Md. 2014) (citations omitted).  Thus, to prevail, Defendants must prove that there is no genuine dispute as to a material fact and that they are entitled to judgment as a matter of law regarding any of the four elements above.

### III.    Analysis

#### a.   Maryland state law applies.

"A federal court sitting in diversity must apply the law of the state in which the court is located, including the forum state's choice of law rules." *Rybas*, 21 F. Supp. 3d at 559-60.  For tort claims, "Maryland applies the law of the state where the alleged harm occurred ('*lex loci delicti*')." *Id*. at 560.  In this case, the Court has diversity jurisdiction under 28 U.S.C. §

1332(a)(1).  The alleged events took place in Maryland; therefore, the Court applies the

substantive tort law of Maryland.

> **b.  Live Nation had a duty to protect Plaintiff from crowd-surfing and Live Nation had actual or constructive notice that crowd-surfing was occurring at the concert.**

As already stated, to establish a negligence claim, a plaintiff has to assert: (1) that the

defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached

that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury

proximately resulted from the defendant's breach of the duty.  *Moore*, 147 Md. App. at 337-38.

Whether there is enough evidence of the required elements in a negligence action is a question of

fact to be determined by the fact finder, but the existence of a legal duty is a question of law that

is decided by the court.  *Valentine v. On Target*, 353 Md. 544, 549 (1999).

The parties do not dispute that Plaintiff was a business invitee at the Fillmore the night of

the incident.  A business invitee is "one invited or permitted to enter another's property for

purposes related to the landowner's business."  *Tennant v. Shoppers Food Warehouse Md. Corp.*,

115 Md. App. 381, 388 (Md. Ct. Spec. App. 1997).  A business invitor owes an invitee "a duty to

use reasonable and ordinary care to keep the premises safe and to protect the invitee from injury

caused by an unreasonable risk which the invitee, by exercising ordinary care for his own safety,

will not discover."  *Southland Corp. v. Griffith*, 332 Md. 704, 715-16 (1993).  "Although the

business invitor has a duty to protect against unreasonably dangerous conditions, the business

invitor is not an insurer of the invitee's safety."  *Tennant*, 115 Md. App. at 389.  The business

invitor, therefore, has no duty to warn an invitee of an open, obvious, and present danger.  *Id.*

A business invitor has a duty to protect its business invitees from the actions of third

persons.  *See Litz v. Hutzler Bros. Co.*, 20 Md. App. 115, 122 (Md. Ct. Spec. App. 1974).

However, this duty does not exceed the business owner's general duty to such invitees.  *Id.*

5

"Liability for breach of this affirmative duty may arise from . . . dangers associated with employees or other invitees when [the] business owner, 'as a reasonably prudent person . . . should have anticipated the possible occurrence and the probable results of such acts.'" *Rhaney v. Univ. of Maryland Eastern Shore*, 388 Md. 585, 602 (2005) (citation omitted); *see also Jackson v. A.M.F. Bowling Ctrs., Inc.*, 128 F. Supp. 2d 307, 311 (D. Md. 2001) ("The duty to protect . . . [a plaintiff] against unreasonable risk of harm extends to risks arising out of a defendant's conduct or the intentional or criminal acts of third parties."). In *Jackson*, the Court, relying on the *Restatement (Second) of Torts*, stated that a defendant "is not required 'to take precautions against a sudden attack from a third person which he has no reason to anticipate;'" however, "he is . . . required to act when he knows or has reason to know that the plaintiff is in danger or injured." *Jackson*, 128 F. Supp. 2d at 311-12.

Live Nation[4] argues that this case is like *Lexington Mkt. Auth. v. Zappala*, 233 Md. 444 (1964). Live Nation's Mot. 11-12. Live Nation further argues in its Reply that it cannot be held liable "for the tortious acts of an unidentified third party who crowd surfed in violation of the clearly posted signs." Live Nation's Reply 1-2. In *Zappala*, the plaintiff, a business invitee, sustained injuries after slipping and falling on a spot of oil or grease on the pavement of a self-service parking garage. *Lexington Mkt. Auth.*, 233 Md. at 445. The Court held that the plaintiff failed to establish a case of constructive notice for the jury because there was no evidence that the condition was caused by the business invitor or its employees, or that there was actual notice of the condition. *Id.* at 446. Relying on *Zappala*, Live Nation argues that Plaintiff has not offered any evidence showing how long the alleged crowd surfer was surfing prior to the incident. Live Nation's Mot. 12. Live Nation also argues that since crowd-surfing is a

---

[4] Although the Court is going to refer to "Live Nation's arguments," in light of Noble joining Live Nation's Motion, the Court also takes these arguments as Noble's arguments regarding Plaintiff's claims only.

spontaneous activity, which is impossible to predict, it would be unreasonable to hold that it was Live Nation's duty to protect Plaintiff from crowd-surfing as soon as it occurred. *Id.*

This case is unlike *Zappala* where the Maryland Court of Appeals concluded that the defendant lacked notice of the spill. In this case, a reasonable jury or fact finder could infer from the evidence that Live Nation and Noble were aware that crowd-surfing was taking place at the concert. As the Plaintiff stated in his deposition, he saw a couple of crowd surfers at different times during the concert.[5] Stephanie Steele, the corporate designee for Live Nation, acknowledged in her deposition that Live Nation was aware of crowd-surfing activities at a similar concert.[6] This led Live Nation to determine it was necessary to place signs at the Fillmore prohibiting crowd-surfing. *See* Stephanie Steele's Depo., ECF No. 43-3, p. 149:11-18. Edward Gilmore, Noble's Director of Security for the Fillmore, stated in his deposition that although Noble employees were aware of crowd-surfing, they were not told to stop it,[7] and he did not observe any other security personnel trying to stop the crowd-surfing. Edward Gilmore's Depo., ECF No. 43-5, p. 143:14-17. Instead, according to Mr. Gilmore, the security personnel were assisting the crowd surfers over the barrier and did not tell them to leave the venue. *Id.*, p. 144:1-20. Mr. Gilmore explained that crowd-surfing became an accepted practice, and there was no reason for Noble personnel to report it to Live Nation personnel. *Id.*, p. 163:20-21, p. 164:1-6.

---

[5] "About 40 percent of the way through [the Korn concert] I noticed [2 crowd surfers] to my right about, you know, 10, 15 feet away." Plaintiff's Depo., ECF No. 43-1, p. 67:1-8. "The couple crowd surfers that I saw 40 percent, give or take, through the concert were stopped by the security guards." *Id.*, p. 97:9-12. "Guards were assisting crowd surfers." *Id.*, p. 97:9. During the "Freak on a Leash" song, Plaintiff recalled seeing three to five crowd surfers. *Id.*, p. 72:8-11. Based on videos that Plaintiff saw of the Korn concert, he saw approximately ten crowd surfers when the group performed "Freak on a Leash." *Id.*, p. 71:17-25, p.72:1-4.
[6] At the Korn concert in Indianapolis (which took place before the concert at the Fillmore), there was a crowd surfer. Stephanie Steele's Depo., ECF No. 43-3, p. 149:11-18.
[7] "I was not told to stop crowd surfing [during the Korn concert], not anybody that, the contractors that were with me, we weren't told to stop it." Edward Gilmore's Depo., ECF No. 43-5, p.143:8-13.

Based on the evidence in this case, a fact finder could reasonably infer that Live Nation and Noble knew or should have known, based on past Korn concerts and what was happening the day of the concert, that crowd-surfing was either occurring or likely to occur.  A fact finder could reasonably infer that Live Nation became aware with sufficient time to prevent more crowd-surfing or warn invitees such as Plaintiff.  *See Troxel v. Iguana Cantina, LLC*, 201 Md. App. 476, 498-99 (Md. Ct. Spec. App. 2011) (where the court held that a fact finder could reasonably infer from the evidence that the nightclub being sued knew or should have known about the dangerous condition (violent incidents as a result of drinking) in its premises and had an obligation to take reasonable steps to eliminate the dangerous condition under its control). The Court rejects Live Nation's argument that it is not responsible for the tortious acts of a third person because the law on this issue is clear: if the business invitor could have anticipated the possible occurrence (crowd-surfing) and the probable results (injury to the business invitee), then liability may arise if the business invitor did not exercise reasonable care.  *Rhaney*, 388 Md. at 602; *see also Talmadge v. CEE-IT Live, LLC*, No. CV020468634S, 2005 WL 834424, at *2 (Conn. Super. Ct. March 7, 2005) (The court held that the defendants had a duty to protect their invitees from injuries associated with crowd-surfing, which the defendants were aware was occurring at the concert).  In this case, there is evidence to suggest that Live Nation was aware of the crowd-surfing taking place at the concert and at previous Korn concerts.  Whether Live Nation exercised reasonable care is a question for the jury.  *See Brewer v. Monqui, Inc.*, No. 53939–6–I, 2005 WL 1725709, at *3 (Wash. Ct. App. July 25, 2005) (The court held that the defendant, the possessor of land and concert promoter, owed a duty of reasonable care to reasonably protect the plaintiff, who was injured by a crowd surfer, and whether the defendant exercised such reasonable care was a material factual issue that could not be resolved on summary judgment.)

### c. The Court cannot conclude that Plaintiff was contributorily negligent as a matter of law.

Live Nation argues that Plaintiff was contributorily negligent as a matter of law when he failed to take reasonable care for his own safety.  Live Nation's Mot. 9.  Live Nation states that Plaintiff "had a duty to exercise due care for his own safety by not placing himself in an area [the front of the stage] where crowd-surfing was occurring."  *Id*.  Live Nation also argues, by citing to *Moodie v. Santoni*, 292 Md. 582, 589 (1982) and *Menish v. Polinger Co.*, 277 Md. 553, 563 (1976), that although ordinarily the question of contributory negligence is for the jury to decide, the judge decides this issue as a matter of law when the minds of ordinary and reasonable persons cannot differ.  *Id*. at 7-8.

In response, Plaintiff cites *G.C. Murphy Co. v. Greer*, 75 Md. App. 399, 402 (Md. Ct. Spec. App. 1988) and argues that contributory negligence is a fact-intensive defense for the jury to decide and it is only in the most rare of cases where the judge decides this issue.  Pl.'s Opp. 16-17.  Further, Plaintiff argues that a reasonable jury could find that he was not contributorily negligent.  In support thereof, Plaintiff advances five reasons: (1) Live Nation and Noble's finger-pointing at each other negates any suggestion that Plaintiff was contributorily negligent as a matter of law; (2) a reasonable jury could find that Plaintiff had no reason to believe that crowd-surfing would occur at the event because there were signs everywhere prohibiting crowd-surfing, no one crowd-surfed during most of the concert, and one of the two isolated people who crowd-surfed during a song stopped and the other was safely lowered at the barricade; (3) a jury could find that Plaintiff, knowing that crowd-surfing was prohibited, and not knowing that "Freak on Leash" would incite crowd-surfing, could not have reasonably anticipated that a crowd surfer would injure him; (4) a reasonable jury could find that Plaintiff did not negligently place himself at risk of injury by attending the concert; (5) even if the jury could find that Plaintiff

negligently placed himself at risk of some injury, the kind of injury Plaintiff suffered, a broken

neck, is not the kind of injury he could have imagined he was exposing himself to. *Id.* at 29-32.

Contributory negligence is a total bar to recovery in Maryland, and is defined as the

failure to take ordinary care for one's own safety. *Faith v. Keefer*, 127 Md. App. 706, 745 (Md.

Ct. Spec. App. 1999). "Before the doctrine of contributory negligence can be successfully

invoked, it must be demonstrated that the injured party acted, or failed to act, with knowledge

and appreciation, either actual or imputed, of the danger of injury which his conduct involves."

*State v. Thurston*, 128 Md. App. 656, 665 (Md. Ct. Spec. App. 1999) (citing *Hooper v. Mougin*,

263 Md. 630, 634 (1971)). The defendant has the burden of establishing contributory

negligence. *Id.*

Live Nation is correct in stating that "the absence or presence of contributory negligence

is generally for the jury to decide." *See Moodie v. Santoni*, 292 Md. 582, 589 (1982) (quoting

*Jackson v. Forwood*, 186 Md. 379 (1946)). "It is only where the minds of reasonable persons

cannot differ that the court is justified in deciding the question as a matter of law." *Williamson*

*Truck Lines, Inc. v. Benjamin*, 244 Md. 1, 8 (1966) (citations omitted). To withdraw the issue

from the jury, "[t]he evidence must show some prominent and decisive act which directly

contributed to the accident and which was of such a character as to leave no room for difference

of opinion thereon by reasonable minds." *Baltimore & O.R. Co. v. Plews*, 262 Md. 442, 454

(1971).

The Court rejects Live Nation's assertion that Plaintiff was contributorily negligent by

placing himself in an area where crowd-surfing was occurring after knowing that crowd-surfing

carried a risk of injury. Live Nation's Mot. 9. The issue of contributory negligence does not

turn on Plaintiff's knowledge of the dangerousness of crowd-surfing, but rather it turns on

whether a reasonable person under similar circumstances would understand the inherent risks

associated with crowd-surfing, and whether that person took the proper precautions for their own

safety. *See Delaney v. U.S.*, No. WMN–15–867, 2015 WL 5474265, at * 3 (D. Md. 2015) (citing

*Robertson v. Shell Oil Co.*, 34 Md. App. 399 (Md. Ct. Spec. App. 1977)).  In *Delaney*, the

plaintiff, who worked providing security services to a federal facility maintained by the General

Services Administration (GSA), warned his employer that there was a metal tack strip that

needed to be replaced at Post 11.  *Id*. at 1.  Post 11 was inspected and the repairs were not made.

*Id*.  Subsequently, the plaintiff tripped and fell when the metal strip lifted and caught his boot.

*Id*.  The defendant moved to dismiss or in the alternative, for summary judgment.  *Id*.  The Court

treated the motion as a motion for summary judgment.  *Id*.  Similar to this case, the defendant

argued that the plaintiff was contributorily negligent as a matter of law.  The Court rejected the

defendant's assertion and reasoned that "[t]he issue of contributory negligence turns not on

Plaintiff's knowledge of the defect but rather on whether a reasonable person under the

circumstances would understand the inherent risks associated with the defect and take proper

precautions for their own safety."  *Id*. at 3.  The Court also concluded that "[w]hether Plaintiff

acted reasonably under the circumstances, including whether Plaintiff fully appreciated the

danger posed by the condition of the metal strip is an issue for jury consideration."  *Id*. at 3

(citing *McKenzie v. Egge*, 207 Md. 1 (1955)).  Similar to *Delaney*, the Court cannot conclude

here that Plaintiff was contributorily negligent as a matter of law.  The question of whether an

objectively reasonable person in the position of Plaintiff would have appreciated the risk posed

by crowd-surfing is an issue for jury consideration.

        **d.  The Court cannot conclude that Plaintiff assumed the risk of his injuries as a
matter of law.**

Live Nation also argues that Plaintiff's claims are barred because he assumed the risk

when he stood in a crowd where crowd-surfing was taking place.  Live Nation's Mot. 10.  Live

Nation further contends that the fact that Plaintiff may not have expected the severity of the injury he allegedly sustained is irrelevant to whether he assumed the risk of an injury.  *Id.*

In response, Plaintiff argues that assumption of risk is a subjective inquiry which goes to whether the defendant had a duty to the plaintiff at all.  Pl.'s Opp. 15.  Plaintiff cites *Schroyer v. McNeal*, 323 Md. 275, 283 (1991) for the proposition that Defendant must prove that (1) the risk of danger was fully known to and understood by the plaintiff, and (2) knowing and appreciating the precise risks, the plaintiff intentionally subjected himself to those risks.  *Id.*  Plaintiff again relies on *G.C. Murphy Co. v. Greer*, 75 Md. App. 399, 402 (Md. Ct. Spec. App. 1988) and adopts here the identical arguments originally made with respect to contributory negligence, which can be found in Section III(c) above.

In its Reply, Live Nation cites to *ADM P'ship v. Martin*, 348 Md. 84, 91-92 (1997) and *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 630 (1985) and argues that the assumption of risk inquiry is an objective inquiry rather than a subjective inquiry.  Live Nation's Reply 3.  Live Nation asserts that the Court has to analyze whether Plaintiff (1) had knowledge of the risk of danger, (2) appreciated that risk, and (3) voluntarily exposed himself to it.  *Id.* at 3-4.  In addition, Live Nation states that the court in *Liscombe* and *Schroyer* did not hold that the assumption of risk inquiry contemplated whether there was a risk of suffering the precise injury that the plaintiff sustained; instead the assumption of risk injury merely looked at whether the plaintiff knew and appreciated that there was a risk of danger.  *Id.* at 4.  Live Nation then suggests that, based on his deposition, Plaintiff understood and appreciated the danger of standing in a crowd when crowd-surfing was taking place; therefore, it is irrelevant that Plaintiff could not have predicted the exact injury he suffered.  *Id.* at 4-5.

In Maryland, assumption of risk, like contributory negligence, is a bar to recovery. *Prudential Securities Inc. v. E-Net, Inc.*, 140 Md. App. 194, 226 (Md. Ct. Spec. App. 2001).

While contributory negligence "consists of some act of negligence on the part of a plaintiff which directly contributed to the happening of the accident," assumption of risk "means the voluntary act of incurring the risk of an accident which may not occur and which the person assuming the risk may be careful to avoid." *Wiggins v. State*, 232 Md. 228, 240 (1963).  The defendant must prove three elements to establish the defense of assumption of the risk: (1) the plaintiff had knowledge of the risk of the danger; (2) the plaintiff appreciated that risk; and (3) the plaintiff voluntarily confronted the risk of danger.  *Thomas v. Panco Mgmt. of Maryland, LLC*, 423 Md. 387, 395 (2011) (citing *ADM P'ship v. Martin*, 348 Md. 84, 90-91 (1997)).  "The question of whether the plaintiff had knowledge and appreciation of the particular risk at issue is ordinarily a question for the jury, 'unless the undisputed evidence and all permissible inferences therefrom *clearly* establish that the risk of danger was *fully* known to and *understood* by the plaintiff.'"  *Id.* (quoting *Schroyer v. McNeal*, 323 Md. 275, 283 (1991)) (emphasis in original).  "Where it is clear, however, 'that a person of normal intelligence in the position of the plaintiff *must* have understood the danger, the issue is for the court.'"  *Id.* (emphasis in original).

The Court of Appeals of Maryland has stated that " . . . in order for a plaintiff to have assumed the risk of his or her injuries as a matter of law, we require that a plaintiff 'must' have known that the risk was 'actually present,' not that he or she 'would,' 'should,' or 'could' have known that the risk 'might well be present.'"  *Id.* at 398 (citing *Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 123 (2011)).  Under Maryland law,

> [c]ourts may only impute knowledge to the plaintiff, as a matter of law, when there is undisputed evidence of awareness, e.g., physical interaction with or sensory perception of the dangerous condition . . .; the risk of danger is so obvious that any person of normal intelligence will be taken to comprehend it . . .; or the risk is an usual and foreseeable consequence of the plaintiff's conduct . . . .

*Id.* (internal citations omitted).  Aside from these circumstances, the Maryland Court of Appeals has held that "[w]here there is a dispute whether the risk is assumed or not, that question is

usually left to the jury . . . because the role of the fact finder is to assess the credibility of the evidence and to draw a conclusion from among the inferences which may be reasonably drawn from that evidence." *Id*. at 399.  (citing *Poole*, 423 Md. at 124).  "[F]or a court to impute knowledge as a matter of law, the evidence and all permissible inferences must make clear that the plaintiff had full, actual, and subjective knowledge of the risk or that 'a person of normal intelligence in the position of the plaintiff *must* have understood the danger.'"  *Id*. at 400 (citing *Poole*, 423 Md. at 125) (emphasis in original).

In this case, the Court cannot conclude that Plaintiff assumed the risk as a matter of law. There is no undisputed evidence that Plaintiff fully knew and understood the risk of the danger. Although Plaintiff had seen crowd surfers at the concert, he did not see anyone getting hurt by the crowd surfers.  At most, Plaintiff saw crowd surfers that were stopped by the security guards or guards that were assisting the crowd-surfers.  Plaintiff's Depo., ECF No. 43-1, p. 97:9-12. Live Nation points the Court to Plaintiff's deposition where he states that he "understood that it was possible" that a crowd surfer could fall in the process of crowd-surfing, and where Plaintiff acknowledges that he was aware that there was a "limited risk" of for example getting kicked in the shoulder or "smacked in the head."  Live Nation's Reply 5.  These acknowledgements from Plaintiff support a conclusion that he "would," "should" or "could" have known that there were risks associated with crowd-surfing.  However, this evidence does not show that Plaintiff "must" have known that the risk of being injured by a crowd-surfer was actually present.  Since there is no undisputed evidence that Plaintiff knew and understood the risk of the danger he was facing, and since there is a dispute as to whether Plaintiff assumed the risk, this issue is to be decided by the jury and not by the Court.

   **e.   Live Nation is entitled to summary judgment as to Noble's cross-claims for breach of contract and indemnity.**

In its motion, Live Nation argues that it is entitled to summary judgment as to Noble's claims for breach of contract and indemnity because there is no evidence that the Services Agreement was modified or revised.  Live Nation's Mot. 12.  Live Nation states that the Services Agreement required Noble to provide crowd management services and crowd control.  *Id.*  Live Nation posits that Noble has not produced evidence of any agreement or writing that amended the Services Agreement; therefore, Noble cannot claim that the scope of the services it was required to provide was somehow revised.  *Id.* at 13.

Noble responds that starting on April 2012, Live Nation took over all security operations at the Fillmore, and Noble was only required to provide "consulting services" for the next six months.  Noble's Cross-motion 3.  Noble explains that as part of these consulting services, it was supposed to provide consultants but not security guards.  *Id.*  It is Noble's position that as a consultant, if it observed crowd-surfing, it was not permitted to take any direct action.  *Id.* 3-4.  Therefore, Noble states, on the date of the alleged incident, any decision regarding crowd management was within the sole discretion of the Fillmore and Live Nation.  *Id.* at 4.

In its reply, Live Nation argues that Noble has failed to present any evidence of a written agreement between Live Nation and Noble where Live Nation promised to take over all security operations at the Fillmore.  Live Nation's Reply, ECF No. 47, 2.  Without such a written agreement modifying the Services Agreement, Live Nation argues, Noble was responsible for crowd management services at the concert.  *Id.* at 3.  Therefore, Live Nation continues, since Noble was responsible for providing crowd control services, to the extent that lack of crowd control services was a cause of Plaintiff's injuries, then Noble breached the contract.  *Id.*

The Court finds that under the Services Agreement Noble was required to provide crowd management services, and any changes to the agreement should have been made in writing.  Under Maryland law, courts adhere to the principle of the objective interpretation of contracts.

*Ubom v. SunTrust Bank*, 198 Md. App. 278, 286 (Md. Ct. Spec. App. 2011) (citation omitted).

Under this principle, unless a contract's language is ambiguous, courts give effect to the

language as written without concern for the subjective intent of the parties at the time the

contract was formed.  *Id*.  Courts only look to the four corner of the contract, and "ascribe to the

contract's language its customary, ordinary, and accepting meaning."  *Id*.

In this case, the contract is not ambiguous.  Under the Services Agreement, Noble was

required to "provide crowd management services . . . including crowd management staff and

security staff . . .".  Noble was required to provide "(i) crowd control . . ., (iv) direction and

control of the audience to deter any crowd disturbances."  ECF No. 39-2, p. A-1, ¶1.  More

specifically, Noble was required to "use best efforts to monitor, keep secure and maintain

reasonable control over those individuals . . . body-surfing in the general admission area located

directly in front of the stage and/or in front of a staffed barricade."  ECF No. 39-2, p. A-1, ¶4.

Any changes to the agreement had to be made in writing.  The Services Agreement provided that

the agreement "may not be amended, revised or terminated orally but only by a written

instrument executed by the Party against which enforcement of the amendment, revision or

termination is asserted."  ECF No. 39-2, p. 3, ¶ 9(B).  This requirement was restated in a

different section of the Services Agreement, where it was stipulated that "[Live Nation] and

[Noble], upon mutual agreement, may designate material additions or changes to the Scope of

Work, which shall be confirmed in writing and signed by authorized representatives of the

Parties."  ECF No. 39-2, p. A-1, ¶6.  There is no written instrument before the Court that

amended the Services Agreement.  For this reason, the Court grants summary judgment in favor

of Live Nation as to Noble's contract claim.

Live Nation is also entitled to summary judgment as to Noble's claim for indemnity.

Under the Services Agreement, Live Nation agreed to "indemnify, defend and hold harmless

[Noble] . . . from any and all claims or liabilities . . . for . . . injury to persons . . . arising from [Live Nation's] negligence or willful misconduct." ECF No. 39-2, p. 2, ¶ 5(B).  Under the Services Agreement, Noble was responsible for crowd management services.  Noble failed to provide these services and this omission contributed to Plaintiff's injury.  Consequently, Live Nation is not required to indemnify Noble.

### f.   Noble's Cross-motion for summary judgment against Live Nation is denied.

In the Cross-motion, Noble argues that if the Court were to look solely to the Services Agreement, under paragraph 5(B), it is clear that if Plaintiff establishes a *prima facie* case of negligence, the sole negligent actor is Live Nation because Live Nation was required to provide crowd control services.  Noble's Cross-motion 4-5.  Therefore, Noble argues, Live Nations owes Noble defense and indemnification, including attorney's fees.  *Id*.  Noble further argues that even if the Court determines that Noble is not entitled to contractual indemnification, Noble is entitled to common-law indemnification and attorney's fees under the "active/passive" doctrine.  *Id*. at 5.  The Court already determined that under the Services Agreement, Noble was required to provide crowd control services.  Therefore, Noble is not entitled to indemnification and attorney's fees as a result of Plaintiff's injuries.

### IV.    Conclusion

For the foregoing reasons, the Court **GRANTS in part and DENIES in part** Live Nation's Motion.  Live Nation's Motion is granted as to Noble's contract and indemnity claims and it is denied as to Plaintiff's claims.  The Court also **DENIES** Noble's motion for summary judgment as to Plaintiff's claims, and **DENIES** Noble's Cross-motion against Live Nation.


February 1, 2016                                     _____/s/_____
                                                            Charles B. Day
                                                            United States Magistrate Judge

CBD/yv